FILED
2022 MAR 25 PM 2:59
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BEHAVIORAL MEDICINE CONSULTING, LLC, a Montana limited liability company, and KEITH BROWN, M.D., an individual,<br><br>Plaintiffs,<br><br>v.<br><br>CHG COMPANIES, INC., dba COMPHEALTH, a Delaware corporation,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00967-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is a motion for summary judgment filed by Defendant CHG Companies, Inc., dba CompHealth ("CompHealth") [ECF No. 39]. The court heard oral argument on the motion on March 21, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court GRANTS Defendant's motion for summary judgment.

## FACTUAL BACKGROUND

CompHealth is a locum tenens recruiting company. "Locum tenens" is the term used in the staffing industry to describe temporary physician placement. CompHealth recruits physicians and matches them with healthcare facilities in need of temporary physician coverage. ECF No. 30 ¶ 8. Dr. Keith Brown ("Brown"), the sole member of Behavioral Medicine, is a medical doctor specializing in psychiatry. ECF No. 30 ¶¶ 1-2. In June 2019, CompHealth approached Brown for locum tenens placement. Brown gave CompHealth his resume to review.

I.       THE PROFESSIONAL SERVICES AGREEMENT

On July 10, 2019, Behavioral Medicine entered into a Professional Services Agreement ("PSA") with CompHealth. ECF No. 30-1 at 1. Under the PSA, Brown agreed to work as an independent contractor to furnish locum tenens physician services to CompHealth clients. *Id*. Pursuant to the PSA, CompHealth assigned Brown to provide inpatient psychiatric services to CompHealth's client, Western State Hospital in Lakewood, Washington ("WSH"). *Id*. ¶ 11.

The PSA contains several provisions governing termination of the contract. Section 4.1 of the PSA lists the circumstances under which "CompHealth may immediately cancel this Agreement or any Assignment without notice or liability to [CompHealth]." *Id*. § 4.1. Specifically, the PSA reserves CompHealth's right to immediately cancel its contract with a physician "upon CompHealth's reasonable determination that Doctor is not insurable under CompHealth's malpractice policy and/or does not meet CompHealth credential standards." *Id*.

Section 4.4 of the PSA provides that "CompHealth may terminate [the PSA] or any Assignment," for any reason, "upon thirty (30) days' notice" to Behavioral Medicine. *Id*. § 4.4 The PSA further provides that if CompHealth provides less than thirty days' notice of cancellation, CompHealth's maximum liability is the amount of compensation Behavioral Medicine would have earned for the number of work days scheduled between the date of cancellation and thirty days. *Id*.

Additionally, for a period of two years after termination of the PSA, Behavioral Medicine may "not provide locum tenens services to Clients for whom [Behavioral Medicine] performed, or was introduced to perform, services unless such locum tenens services are furnished through CompHealth." *Id*. § 3.

II.   **COMPHEALTH'S CONTRACT WITH WSH**

CompHealth entered into a Client Service Contract, dated July 1, 2018, with the Washington State Department of Social & Health Services. The Client Service Contract applies to WSH (the "WSH Contract.") ECF No. 30 ¶ 31. The WSH contract requires WSH to pay CompHealth a "Contract Buyout Fee" in the event a physician accepts a position with WSH within one year of the date CompHealth presented the physician to WSH.

III.  **COMPHEALTH'S INVESTIGATION OF BROWN'S CREDENTIALS**

After receiving and reviewing Brown's resume, CompHealth offered Brown temporary placement with WSH. Brown accepted. However, through its credentialing process – a process which begins after both the hospital and the physician agree to a locum tenens arrangement – CompHealth determined that Brown did not have the qualifications necessary to be credentialed as an inpatient psychiatrist. Specifically, Brown had not worked in an "inpatient" psychiatric setting in the past twenty-four months as of July 16, 2019. Accordingly, CompHealth's malpractice policy would not cover Brown. On July 16, 2019, CompHealth confirmed its decision to cancel the WSH assignment in writing to Brown. ECF No. 30-3.

After CompHealth cancelled Brown's placement due to his uninsurability, WSH informed CompHealth that it still wanted to hire Brown outside of the CompHealth relationship. ECF No. 30, ¶ 38. But CompHealth did not relay this information to Plaintiffs. Ultimately, when faced with the Contract Buyout Fee, WSH stopped pursuing Brown. *Id*.

IV.   **PLAINTIFFS' COMPLAINT AND ALLEGED DAMAGES**

On November 25, 2020, Plaintiffs filed an amended complaint against CompHealth. Plaintiffs assert damages in the amount of $224,000 for the alleged six-month lost assignment at WSH. ECF No. 30.

Defendants filed a motion for summary judgment, arguing that its decision to cancel the WSH assignment with Brown was permissible under the unambiguous terms of the PSA.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

Plaintiffs bring the following causes of action against CompHealth: (i) Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing; (ii) Breach of Fiduciary Duty; (iii) Interference with Prospective Economic Relations; (iv) and Material Misrepresentation.[1] The court addresses, and rejects, each in turn.

I. **BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Plaintiffs' first cause of action is for "Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing." To support their claim, Plaintiffs allege that CompHealth

---

[1] Plaintiffs' Amended Complaint also alleges a cause of action for Lack of Consideration; Failure of Consideration. In their opposition memorandum, Plaintiffs concede that this cause of action is no longer viable and therefore consent to its dismissal. ECF No. 43 at 36. The Court therefore dismisses with prejudice Count IV of the Amended Complaint.

breached the PSA and/or duty of good faith and fair dealing by cancelling Brown's assignment at WSH. Plaintiffs allege CompHealth further breached the contract and/or duty of good faith and fair dealing by requiring WSH to pay the Contract Buyout Fee before independently hiring Brown.

### A. *Breach of Contract*

CompHealth argues that the terms of the contract are unambiguous and therefore can be interpreted as a matter of law. Under sections 4.1 and 4.4 of the PSA, CompHealth alleges it had the right to terminate the PSA or any assignment made pursuant to the PSA for any reason and it terminated Brown's assignment, justifiably, when it could not insure Brown under its malpractice insurance.

The court agrees that the terms of the contract are unambiguous, and therefore, may be interpreted by the court. "The interpretation of a clear and unambiguous written agreement . . . is one of law for the court and may be decided upon a motion for summary judgment." *Zollman v. Myers*, 797 F. Supp. 923, 925 (D. Utah 1992) (citations and quotations omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank v. American Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002)(citation omitted).

Both section 4.1 and section 4.4 of the PSA permitted CompHealth to terminate Brown's assignment to WSH. Specifically, section 4.1 unambiguously provides that "CompHealth may immediately cancel . . . any Assignment . . . upon CompHealth's reasonable determination that Doctor is not insurable under CompHealth's malpractice policy and/or does not meet CompHealth credentialing standards." ECF No. 30 § 4.1(f).

Plaintiffs argue that the question of "reasonable determination" is a factual question that should be submitted to the jury. In support, Plaintiffs cite to their expert, Dr. Holmberg, who opined that CompHealth's credentialing standard was unreasonable and unrealistic in the psychiatric profession. ECF No. 43 at 27. Dr. Holmberg's opinion, however, largely questions the reasonableness of CompHealth's underlying credential standard rather than the reasonableness of CompHealth's application of that standard to Brown's qualifications. Plaintiffs failed to offer any evidence that CompHealth was acting under pretext or for an ulterior motive when determining that Brown failed to meet its credentialing standards. There is no evidence that CompHealth was acting in a manner other than in its normal course of business. Indeed, CompHealth had every reason to try to credential Brown; CompHealth stood to gain a $35,000 fee for placing Brown with WSH. At bottom, there are no facts from which a factfinder could determine that CompHealth acted unreasonably, and therefore, summary judgment is proper. *See Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.* 889 P.2d 445, 450 (Utah 1995) (holding that a trial court may grant a motion for summary judgment "only when reasonable minds could not differ on the facts to be determined from the evidence presented").

But even if the court were to find that disputed issues of fact precluded summary judgment under section 4.1, section 4.4 grants CompHealth the right to terminate any assignment, for any reason, upon thirty days' notice. *See id.* § 4.4. Section 4.4 provides that if CompHealth cancels an assignment with less than thirty days' notice for any reason other than those allowed in section 4.1, CompHealth's maximum liability is the amount Brown "would have earned for the number of work days scheduled between thirty (30) days and the number of days' notice of cancellation actually given." ECF No. 30 § 4.4.

Here, it is undisputed CompHealth provided written cancellation of the assignment on July 16, 2019, twenty-seven days before the assignment was scheduled to begin on August 12, 2019. Thus, there would have been only three scheduled workdays during the thirty-day notice period. CompHealth's maximum liability is therefore limited to the compensation Brown would have earned for three days of work. Brown is precluded from recovering more than that three-day dollar amount.

In short, under either section 4.1 or section 4.4, CompHealth had the right to cancel Brown's assignment. And CompHealth chose to exercise that right. CompHealth acted within the unambiguous terms of the PSA. Accordingly, Plaintiffs' claim for breach of contract is dismissed with prejudice.[2]

### B. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs similarly cannot prevail on their claim for breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing prohibits a party to a contract from acting in bad faith such that the other party is deprived of receiving the benefits of the contract. *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004). "Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of a contract." *Id*. "A violation of the covenant is a breach of the contract." *Id*. Plaintiffs argue that CompHealth breached the implied covenant by (1) unreasonably determining that Brown was uninsurable, (2)

---

[2] The court further notes that Plaintiffs' claim that CompHealth breached the WSH contract by requiring WSH to pay the Contract Buyout Fee to hire Brown is similarly without merit. The Contract Buyout Fee was contained in a separate contract between CompHealth and WSH. Plaintiffs lack standing to attempt to enforce a breach of contract claim for a contract to which they are not a party.

7

enforcing the Contract Buyout Fee in its contract with WSH, and (3) failing to inform Brown that WSH might want to independently hire him outside of CompHealth's placement.

But Plaintiffs' argument misses the mark. It is well-settled that the covenant of good faith and fair dealing cannot establish new, independent rights or duties not agreed upon by the parties. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Nor can a party breach the covenant by enforcing the contract's express terms. *See id*. ("A covenant of good faith [cannot] be used to nullify a right granted by a contract to one of the parties."). And finally, the implied covenant of good faith and fair dealing cannot be used to alter the express terms of a contract. *See Vender Veur v. Groove Entertainment Technologies*, 452 P.3d 1173 (Utah 2019). In other words, an implied covenant cannot trump an express contract.

Here, the express terms of the PSA enabled CompHealth to terminate the contract for any reason, including if Brown was uninsurable. The fact that Plaintiffs are now upset that CompHealth exercised that right for its own benefit – a right that Plaintiffs freely and deliberately negotiated with CompHealth – does not mean that CompHealth did so in a way that was unfair or in bad faith. At bottom, CompHealth simply chose to exercise a provision in the contract between the parties – a contract term to which both parties agreed.

Neither does CompHealth's decision to enforce the Contract Buyout Fee in the WSH Contract give rise to a claim for breach of the implied covenant of good faith and fair dealing. As an initial matter, CompHealth negotiated its contract with WSH independent of Plaintiffs. Accordingly, the WSH contract grants Plaintiffs no enforceable rights. CompHealth's decision to enforce the WSH contract terms does not enable Plaintiffs to somehow hold CompHealth liable for an implied breach of a completely different contract.

Finally, CompHealth's decision not to inform Plaintiffs of WSH's interest in independently hiring Brown does not breach an implied covenant. The PSA contained no provision requiring CompHealth to inform Plaintiffs of such information. The court declines Plaintiffs' invitation to unilaterally impose a new condition in the contract for which the parties did not bargain. At bottom, Plaintiffs have failed to show that CompHealth engaged in any bad faith or unfair dealing. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

## II. BREACH OF FIDUCIARY DUTY

Plaintiffs premise their second cause of action for breach of fiduciary duty on the existence of an alleged fiduciary relationship between CompHealth and Behavioral Medicine. Plaintiffs argue that CompHealth acted as an agent for Behavioral Medicine because CompHealth consented to act on behalf of Plaintiffs and sought the opportunity to do so. Although CompHealth undoubtedly attempted to connect Plaintiffs to CompHealth clients, as parties negotiating an arms-length contract, CompHealth owed no fiduciary duty to Plaintiffs.

A fiduciary relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *City of Grantsville v. Redevelopment Agency of Tooele City*, 233 P.3d 461, 473 (Utah 2010) (quotations omitted). A party can establish consent to form an agency relationship by contract or by implication under the factual circumstances. *First Sec. Bank N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 (Utah 1990). To determine whether to imply a fiduciary duty, courts consider the following principles:

> A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority

9

>of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

*Id*. at 1333 (internal quotation omitted).

Consistent with these principles, courts have held that a fiduciary duty generally does not arise in a business transaction absent extraordinary circumstances. According to the Tenth Circuit, "most contracts involve a degree of the factors indicative of reposed trust and confidence." *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) (applying Oklahoma law). But a fiduciary duty arises only where a contract involves the "substitution of will of the defendant for that of the plaintiff in material matters." *Id*. Accordingly, "common commercial dealings are not subject to heightened fiduciary responsibilities. As we have held, parties may deal at arms-length for mutual profit without subjecting themselves to heightened fiduciary duties." *Id*. Indeed, "[m]ost business relationships or contractual relationships . . . do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions." 37 C.J.S. *Fraud* § 11 (2008).

Applying these standards, there is no basis to find a fiduciary relationship between CompHealth and Behavioral Medicine. The two parties dealt at arms-length with one another. There is no evidence that CompHealth consented to act as Behavioral Medicine's fiduciary or that Behavioral Medicine viewed CompHealth as its fiduciary. Indeed, the PSA's plain language – and Plaintiffs' own allegations – establish that no fiduciary relationship existed. As Plaintiffs allege in their Amended Complaint, it was Behavioral Medicine, and not CompHealth, who "retained ultimate control over placements to be made by CompHealth." ECF No. 30 ¶ 65. And "[a]ny such placement was subject to Behavioral Medicine's availability." *Id*. Moreover, "[f]or

each opportunity offered, Behavioral Medicine had the right to confirm the availability and provide verbal consent to an assignment" and "the right to decline any opportunity offered." *Id*.

The Amended Complaint thus alleges that Behavioral Medicine's interest and authority were *not* placed in CompHealth's hands, and CompHealth did *not* have superiority over Behavioral Medicine. To the contrary, the PSA is a standard services agreement executed at arms-length that gave substantial control to Behavioral Medicine. Because the court finds no fiduciary relationship between CompHealth and Behavioral Medicine, Plaintiffs' claim for breach of fiduciary duty is dismissed with prejudice.[3]

### III.    INTERFERENCE WITH ECONOMIC RELATIONS

Plaintiffs' third cause of action alleges that CompHealth interfered with Plaintiffs' prospective economic relations with WSH by "refus[ing] to let Dr. Brown work at WSH unless CompHealth was compensated." ECF No. 30 ¶ 84. Plaintiffs also allege that WSH informed CompHealth that WSH still wanted to hire Brown but CompHealth failed to relay that message to Plaintiffs. Accordingly, Plaintiffs argue, CompHealth interfered with Plaintiffs' economic relations.

To establish a claim for intentional interference with economic relations, a plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff. *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015). But "a person is not liable for intentional interference

---

[3] Moreover, the court notes that under the terms of the PSA, Behavioral Medicine is an independent contractor. Independent contractor status is not within the realm of "certain special" or "extraordinary" business relationships that Utah has previously determined warrant fiduciary duties, such as in the context of escrow agents, *Orlando Millenia v. United Title Servs. of Utah*, 355 P.3d 965, 971-72 (Utah 2015), attorney-client relationships, *Norman v. Arnold*, 57 P.3d 997, 1001-02 (Utah 2002), and business partners, *Ong Int'l. (U.S.A.) v. 11th Ave. Corp.*, 850 P.2d 447, 453-55 (Utah 1993). The lack of such an "extraordinary" relationship further supports the court's finding that CompHealth owed no fiduciary duty to Plaintiffs.

where the person engaged only in conduct in which he or she was legally entitled to engage." *C.R. England v. Swift Transp. Co.*, 437 P.3d 343, 354 (Utah 2019). Accordingly, "the scope of actionable conduct within the tortious interference context [is limited] to those situations where a defendant employs a means that is independently tortious or wrongful." *Id*.

Improper means are present "where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules," *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (citation omitted), or if the improper means violate "an established standard of a trade or profession." *C. R. Eng.*, 437 P.3d at 353. Improper means also include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id*.

Plaintiffs allege CompHealth used improper means by "refus[ing] to allow Dr. Brown to work at WSH independently or to allow any other recruiting firm to place him there." ECF No. 30 ¶ 86. Plaintiffs also allege that CompHealth failed to inform Brown that WSH wanted Brown to apply for work directly. Solely on these facts, Plaintiffs allege that "a reasonable jury could find CompHealth acted intentionally" to interfere with Plaintiffs' prospective economic relations. ECF No. 43 at 34.

Plaintiffs' argument is not well-taken. Utah defines improper means "narrowly,*" C.R. Eng.*, 437 P.3d at 353. Accordingly, "a defendant should not be liable for interfering with a contract where the interference was caused by the defendant's 'doing of an act which he had a legal right to do.'" *Id*. Indeed, a claim for interference with economic relations does not cover every injury caused in the marketplace. Rather, "in the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage, but [] the law

offers no remedy for those damages – even if intentional – because they are an inevitable byproduct of competition." *Id*. (internal citations omitted).

Here, Plaintiffs allege that CompHealth failed to inform Plaintiffs of WSH's interest in hiring Brown. Plaintiffs adduce no evidence that CompHealth deliberately chose to not forward this information to Plaintiffs. But even if that were the case, CompHealth was within its legal rights to do so. Failing to inform Plaintiffs that WSH wanted Brown to apply for employment does not violate any "statutes, regulations, or common-law rules." *St. Benedict's Dev. Co.*, 811 P.2d at 201. Nor have plaintiffs provided any evidence showing a violation of an established trade or professional standard.[4] And CompHealth had every right to enforce the Contract Buyout Fee in the WSH Contract. In short, Plaintiffs present no evidence of improper means that would qualify under the Utah Supreme Court's narrow definition of tortious interference. *See C.R. Eng.*, 437 P.3d at 353 (noting that Utah Supreme Court has been "careful to limit" tortious interference claims). Plaintiffs' claim for interference with economic relations is dismissed with prejudice.

IV.     **MATERIAL MISREPRESENTATION**

Plaintiffs' final cause of action alleges material misrepresentation. Specifically, the Amended Complaint alleges that Plaintiffs relied upon CompHealth's misrepresentation that once Behavioral Medicine signed the contract, it was a "done deal" that Brown would be assigned to WSH. ECF No. 30 ¶ 97. Plaintiffs allege they did not know of any further credentialing requirements and, had they known, Behavioral Medicine would not have signed the PSA. *Id*. ¶ 101. Plaintiffs contend that CompHealth's failure to notify Plaintiffs of the credentialing requirement constitutes a material misrepresentation for which Plaintiffs are entitled to recover damages.

---

[4] Plaintiffs bear the burden of "establish[ing] the existence of an industry-wide standard," *see C.R. Eng.*, 437 P.3d at 353, and failed to do so.

A contract is voidable "[i]f a party's manifestation of assent is induced by either a fraudulent or material misrepresentation by the other party upon which the recipient is justified in relying." Restatement (Second) of Contracts § 164(1) (1981). A misrepresentation may occur either by affirmative statement or by material omission, where there exists a duty to speak. *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980). But courts infer no duty to speak, where the parties deal at arms-length, and where the underlying facts are reasonably within the knowledge of both parties. *Id*. Under such circumstances, the plaintiff is obligated to take reasonable steps to inform himself, and to protect his own interests. *Id*.

Here, Plaintiffs' arguments alleging material misrepresentation belie the facts and the plain language of the PSA. The PSA openly states that even after signing, CompHealth could cancel if the doctor "does not meet CompHealth's credentialing standards" or is not insurable under CompHealth's malpractice policy. ECF No. 30 § 4.1(f). Moreover, the Assignment Acceptance letter specifically states that the Assignment is "subject to the cancellation provisions of the [PSA]," ECF 30-3, which again, detail the credentialing requirement. Indeed, Plaintiffs' own allegations state that "Dr. Brown had to sign the Agreement before [CompHealth] put in the 'time and effort' to credential him." ECF No. 43 at 35. The evidence demonstrates that Plaintiffs were on notice of the credentialing requirement – through the PSA, through the sales representative's emails, and by their own admissions. Plaintiffs' failure to negotiate more desirable terms in the PSA cannot now be taken as a material misrepresentation on the part of CompHealth. Plaintiffs' claim for material misrepresentation is dismissed with prejudice.

## CONCLUSION AND ORDER

For the foregoing reasons, the court GRANTS CompHealth's motion for summary judgment.

DATED March 25, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge